# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3992-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

V.G.R.A.,

     Defendant-Appellant,

and

N.A.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.N.A.,
I.G.A., and M.G.A.R.,

     Minors.

_____

Submitted October 2, 2025 – Decided October 24, 2025

Before Judges Mawla and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0222-21.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant V.G.R.A. (Eric Storjohann, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Division of Child Protection and Permanency (Donna Arons, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the briefs).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors N.N.A. and M.G.A.R. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, Designated Counsel, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor I.G.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant V.G.R.A. appeals from a May 9, 2025 judgment terminating her parental rights to three of her children, N.N.A. (Novia), I.G.A. (Ivy), and M.G.A.R. (Maria).[1] We affirm.

---

[1] Pursuant to Rule 1:38-3(d), we use initials and pseudonyms to identify the parties.

A-3992-23

Following a four-day trial, in which the Division of Child Protection and Permanency (Division) presented the testimony of four of its employees, Judge Russell Wojtenko, Jr. issued a comprehensive written opinion, finding the Division had satisfied the four prongs of the best interests test, N.J.S.A. 30:4C-15.1(a). We take the facts from the trial record.

This family has been involved in the child welfare system for nearly a decade due to defendant's unaddressed mental health, substance abuse, and housing instability. The parental rights of the children's father, who has not appealed from the judgment, were also terminated due to his substance abuse, housing instability, and criminality.

In 2016, California authorities removed the children from defendant's care due to her mental health problems and failure to take medication. The father was unavailable to care for the children because he was incarcerated in Florida. The parents' respective families were unwilling to serve as placements for the children, a recurring theme in this case. The family was ultimately reunited and relocated to Florida.

In 2018, defendant was staying at a hotel in New Jersey when the Division removed the children again. The Division was granted custody because of defendant's erratic behavior and the family's homelessness. At the time,

defendant was diagnosed with depression, insomnia, schizoaffective disorder, and bipolar disorder. She had not been taking her medication. The children were lacking an education and placed in non-relative placements because no relative was available to take them and defendant did not provide the Division with information regarding possible relative placements.

Following the Division's removal, it offered defendant substance abuse, psychological, and parenting evaluations, supervised visits, and transportation services. Defendant utilized these services yet remained homeless.

The children suffered as a result of the circumstances. Novia was initially placed in a treatment home and subsequently hospitalized for suicidality. She was later moved to a group home. Ivy was admitted to a psychiatric unit, and upon return to her placement, needed therapy and participation in an educational program to address her emotional needs. Maria and Ivy ultimately were placed together in a resource home.

Although defendant made strides in 2018, she relapsed in 2019 and resumed abusing drugs. She initially refused outpatient treatment, but later complied with services. Around this time, the children's father was released from prison. The children were doing well; therefore, the Division's plan was to reunite the children while both parents searched for housing.

A-3992-23

By October 2019, both parents were living in Pennsylvania. They found a home, were visiting the children, and complying with services and medications. The Division's plan was to reunify the family in Pennsylvania. As a result, pursuant to the Interstate Compact on the Placement of Children (ICPC), N.J.S.A. 9:23-5, Pennsylvania conducted an evaluation. The onset of the COVID-19 pandemic slowed down the ICPC process.

Beginning in April 2020, the parents were uncooperative with the Pennsylvania ICPC, which led to its failure later that year. Nonetheless, the Division maintained telephonic visitation between the parents and children during the pandemic and arranged for transportation to New Jersey. However, the parents declined to exercise in-person visitation, were generally non-compliant with seeing the children, and canceled many scheduled visitations.

Given the lack of progress, including the parents' ongoing financial and housing instability, failure to address mental health issues and substance abuse concerns, the court approved the Division's plan of termination of parental rights followed by adoption in December 2020. The Division filed its guardianship complaint in February 2021. In April 2021, the parents traveled to Florida.

The children remained in placement. Novia showed improvement. Ivy was diagnosed with attention deficit hyperactivity disorder, reactive attachment

A-3992-23

disorder, and disinhibited attachment disorder. She was in therapy and received medications to address these conditions. Maria was diagnosed with dyslexia and received speech therapy and counseling.

In March 2021, defendant stopped taking her medications, began behaving erratically, and refused to cooperate with the Division or Division-provided services. She moved from Philadelphia and to York, Pennsylvania. In June 2021, defendant went missing for several months.

In January 2022, both parents notified the Division they had moved to North Dakota. They requested the Division transfer their case there. The Division offered the parents Zoom visitation with the children. By February 2022, the Division reported both parents were doing well in North Dakota and were having visits via Zoom. Novia, however, began to experience behavioral problems. She was moved to a second placement, ran away, and then moved to a group home.

Both parents were complying with services during April, May, and June 2022. In May, the Division ordered an ICPC evaluation in North Dakota. In July, the parents had a positive visit with the children in New Jersey, and the Division funded their transportation. Novia's condition improved.

A-3992-23

In August 2022, both parents came to Pennsylvania and asked to see the children. Although the Division arranged the visit, neither parent came, leaving the children disappointed. The parents separated later that month.

North Dakota denied the ICPC because the parents were not fit to serve as a placement for the children. The Division paid to return defendant to Pennsylvania, but she refused to engage in services, lost touch with the Division, and exercised no visits. In October 2022, the Division received reports the parents were a couple again and were driving around Colorado.

Meanwhile, the Division arranged sibling visitation to ensure the children saw each other while in their placements and provided outpatient therapy to one of the children. In November 2022, Novia's condition further improved. However, that same month, defendant requested the Division no longer contact her. In December 2022, she informed the Division she did not want the children and declined to attend a psychological evaluation.

In January 2023, Ivy still required therapy and repeatedly ran away from her classroom at school. Defendant continued to be transient. In or about February or March 2023, she went to Seattle, Washington and suffered a psychiatric episode before returning to Philadelphia. In March 2023, she missed a second psychological evaluation the Division had scheduled for her. Although

7

she wanted visitation, she refused to submit to a drug screening or attend a bonding evaluation.

In April 2023, the Division explored kinship legal guardianship (KLG) with a relative. A visit in May 2023 had to be ended early because the children were reacting negatively to it. Around this time, Ivy and Maria told the Division they did not want visitation with either parent. Novia wanted visits, but neither parent appeared for one scheduled in July 2023. The following month, she was hospitalized for suicidal ideation. She was then sent to a treatment home.

Defendant continued to refuse a psychological evaluation, attend services, or submit to drug screens. She ultimately lost contact with the Division.

The Division moved forward with an ICPC in Pennsylvania, with the relative it was considering for KLG. Defendant claimed the relative had drug issues. The relative ultimately withdrew himself from consideration because of the children's substantial mental health issues. In September 2023, Maria and Ivy were separated. Ivy was sent to a resource home.

Both parents returned to North Dakota. Defendant would not provide her address, preventing the Division from delivering services to them. Nevertheless, the Division scheduled psychological and bonding evaluations for the parents and arranged transportation. Both parents agreed to the evaluations, traveled to

New Jersey, but then refused to attend the evaluations or see the children. The Division then flew both parents back to North Dakota.

In October 2023, the Division requested North Dakota conduct an ICPC. During December 2023, the Division explored several relatives as placements but all of them declined.

Ivy was hospitalized in January 2024. She attacked her resource parent's child.

Both parents returned to Florida. They refused to consent to the children receiving their treatment or medications. In February 2024, the parents returned to Philadelphia and were once again homeless. Defendant missed therapy appointments and visitation during March 2024, and the Division lost contact with her. The parents' last contact with the children was February 14, 2024; they have not seen the children in person since May 2023. The Division continued to assess other relatives as potential placements, but they were either ruled out or withdrew themselves from contention. As of July 2024, when the judge issued his decision, none of the children were in pre-adoptive homes. Ivy was moved into the therapeutic residential treatment facility where Novia was staying, and Maria moved out of her resource home.

A-3992-23

Based on the evidence, the judge found the Division proved the first best interests prong because of defendant's failure to comply with services to remediate her mental health, substance abuse, parenting, housing, and financial deficits, which "caused actual harm and directly endangered the safety, health, and development of the . . . children." The children were in out-of-home placements for five years and neither parent showed an ability to "manage their own lives." The "parents' transience and untreated mental health issues" prevented the children from having consistent communication with them. Whatever stability either parent demonstrated was temporary. The lack of communication with the Division gave no assurance defendant was receiving mental health or substance abuse treatment. Nothing changed in the five years since the children's removal. Both parents were "unreliable, unreachable, uncommunicative, and unavailable to their children." The "children have spent the majority of their lives in foster placement," and the multiple resource placements exacerbated Novia and Ivy's behavioral issues.

The judge concluded the Division proved the second best interests prong because it showed the parents were unwilling or unable to eliminate the harm to the children, and were unable or unwilling to provide a safe and stable home for them. This was exemplified by the parents' failure over a five-year period to

A-3992-23

successfully complete services, and "to remedy their parenting deficiencies, mental health issues, substance abuse, financial instability, and transientness and homelessness." The children remained at risk of harm because neither parent could "adequately parent or supervise their children." Instead, they "bounced around th[e] country aimlessly to the point where the Division does not know where they currently are." The court determined the children could not rely on their parents due to sporadic visitation and concluded they were entitled to permanency, which could be achieved through select home adoption.

The record was replete with the Division's efforts to work with both parents. However, defendant "achieved only limited compliance with mental health services and medication[] and refused to attend evaluations prior to the guardianship trial." Neither parent completed "the substance abuse treatment services necessary to enable them to be safe and stable parents." They did not attend court "to receive updates on [the] children's medical, emotional and education[al] needs. . . . [A]lthough there was a brief glimmer of hope for reunification when the [parents] were in North Dakota, that hope was short[-]lived when [they] separated and failed to participate in the ICPC assessment."

The judge observed, even though none of the children were in pre-adoptive homes, all three "have been consistent in their desire not to return to

11

the care of their parents. All three children are entitled to stability and neither parent is prepared to offer that in the foreseeable future and that delay will cause the children further harm." The judge concluded terminating parental rights would provide "the opportunity to move closer to permanency via the select home adoption process."

The judge found the Division proved the third best interests prong because it "provided a myriad of services to both [parents] over the many years of litigation including psychological and psychiatric evaluations to obtain recommendations for services, visitation, substance abuse evaluations and treatment, and ICPC referrals to assess their residences in North Dakota and Pennsylvania." Both parents prevented the Division from delivering services by "aimlessly mov[ing] from one state to another," failing to attend scheduled evaluations, and failing to comply with recommendations when they did attend evaluations.

The judge credited the Division witnesses' testimony regarding its efforts to reunify the family or secure a relative placement. The clear and convincing evidence showed KLG "was not possible. All proposed family members were ruled out and none appealed the rule-out letters."

A-3992-23

The Division also met its reasonable efforts obligation "to provide the children with services to address their mental health, educational needs, behavior[al] problems, as well as stabilizing them in their placements." Given the parents' lack of cooperation and the unavailability of other family to serve as a relative resource or KLG, "the only viable option for these children is termination of parental rights followed by select home adoption." Indeed, "[d]iscontinuing the parental relationship will allow all three children to no longer need to manage the disappointment and frustration they have experienced because of the [parents'] instability and intermittent presence in their lives."

The judge credited the testimony that once parental rights have been terminated, "the Division can engage in a full panoply of adoption recruitment opportunities . . . that can lead to stability in a loving, safe and stable home that can help them overcome a lifetime of trauma." Indeed, "[t]he intention of select home adoption is to open many more homes interested in adoption."

The Division proved the fourth best interests prong; that adoption would not do more harm than good because neither parent was presently nor "in the foreseeable future," capable of safely caring for the children. Both parents were in the same or worse position as when the case began five years prior, and there was "no proof in the trial record of a positive or healthy bond . . . between the

13

three children and the [parents]." Discontinuing the parental relationship would end the children's disappointment and frustration, while simultaneously opening the door "to stability in a loving, safe and stable home that can help them overcome a lifetime of trauma."

Because neither parent was fit to parent, and "since the plan is select home adoption, any harm stemming from removal from the current resource homes simply [was] not an issue in the . . . trial." If parental rights were "not terminated, [the] children [would] languish for several more years before potential permanency [could] be achieved . . . as reunification [was] clearly not possible." The fact that Novia and Maria were not in pre-adoptive homes did not change the fact termination would not do more harm than good. Returning the children to their parents "would do more harm than good [and] inevitably place them in harm's way as their parents continue the cycle of unstable mental health, unstable housing, and unstable lives."

Defendant filed her notice of appeal in August 2024. In March 2025, we granted the Division's motion to supplement the record with two contact sheets confirming Ivy and Maria's placements had changed in July 2024. We remanded the matter to the judge to make further findings.

A Division caseworker testified on remand and authenticated both Division records for purposes of supplementing the record. The witness explained Maria would be moving to a new resource home that wished to adopt her, effective June 20, 2025. Novia remained in therapeutic residential treatment and the Division anticipated discharging her to a resource home because she had improved.

Defendant objected to the remand proceedings because she had not received the supplemental records, or the Division's witness list in order to adequately prepare a defense. She claimed the Division denied her access to its file and she also wanted to admit correspondence showing she had requested additional discovery from the Division regarding its witness's testimony. The judge explained the remand was limited to the two documents the Division wished to supplement the record with, and defendant's appellate counsel consented to the remand.

The judge credited the witness's testimony and admitted both contact sheets into evidence. He found the supplemental documents had no bearing on the decision to terminate parental rights because the Division had proven prong four by showing the termination of the parental relationship to free the children for adoption, was in their best interests. In other words, the judge's prong four

15

findings were not predicated on the type of placement the children were in at the time of entry of the judgment. The judge issued an amended judgment affirming his original judgment.

## I.

On appeal, defendant challenges the judge's findings under all four best interests prongs. We address prongs one and two together.

Defendant asserts there was insufficient evidence to show she harmed the children. Instead, the judge blamed her for matters that were out of her control, namely, her poverty and inability to provide housing. Neither of these conditions have anything to do with parental misconduct. Defendant claims the judge should have held the Division responsible for its failure to stabilize the family. Although the judge credited the failure of the ICPC process as evidence of harm, it was not a process defendant could control because it relied on agencies in other states. Here too, the judge effectively blamed her for the Division's inability to locate adequate adoptive homes for the children. However, the Division's inability to provide stable resource placements had no connection to any specific action undertaken by defendant.

Although the judge cited the parents' substance abuse, mental health, and parenting deficiencies as harms, he failed to credit the progress they made during

16

the first two years of the litigation. The judge also ignored the fact the Division erected roadblocks to the parents' progress through the ICPC process and the refusal to transport them to obtain services.

Defendant argues the judge's findings the parents were to blame for the children's behavioral issues were unsupported by the evidence. She asserts there is just as much evidence to conclude their behavioral problems arose from, or were intensified by, their initial separation from family, due to a lack of housing. Defendant was blamed for missed visits while she resided out of state, yet the Division did not provide transportation assistance.

In finding the parents harmed the children and were unwilling or unable to cease doing so, the judge did not consider their efforts to overcome certain obstacles such as when the Division forced them to find their own treatment providers and failed to provide assistance during the pandemic. The judge punished defendant for not completing the ICPC evaluations in Pennsylvania and North Dakota, and failed to recognize the child welfare agencies of those states made arbitrary and unreasonable requests, and operated unchecked by either the Division or the court.

Relatedly, defendant argues we should not accept the judge's prong three findings because they were based on the flawed ICPC process as evidence of the

A-3992-23

Division having met its reasonable efforts obligation. The judge erred because the ICPC is only a means of assessing an out-of-state placement, not a way to assess a parent's fitness. The judge also erred by finding the ICPC dispositive because there was no assurance the other states had fairly evaluated the parents, and the Division inappropriately delegated its reasonable efforts obligation to them.

Defendant also challenges the judge's reasonable efforts findings regarding visitation because the Division failed to provide adequate transportation to facilitate visitation. The judge did not cite specific examples of the Division's reasonable efforts in this regard, and the evidence in the record shows the opposite as her requests for transportation assistance were denied.

Defendant claims she requested assistance in finding services during the pandemic, but the Division "offered nothing." The judge's finding the family's needs were greater than housing, ignored the Division's long-held contention the main barrier to reunification was defendant's housing instability and need for home inspections. In this regard, the judge allowed the Division to delegate its responsibility to Pennsylvania authorities, which resulted in a de facto suspension of the Division's duty to make reasonable efforts to achieve reunification.

18

Defendant argues the judge's prong four findings were wrong because there was insufficient evidence to support his finding, "the children's continued relationship with their parents creates instability, anxiousness, and fear that facilitates other psychological and emotional problems." She claims expert testimony was required for the judge to reach this conclusion, and without it, he was speculating. In the absence of medical evidence, defendant asserts the children's problems could just as likely be attributed to the removal and the absence of their parents from their lives.

Defendant also argues the Division failed to prove prong four because while the plan is for select home adoption, the Division provided no timeline for achieving its goal. The Division did not begin the process until late 2023, and there were no select home adoptions available presently or in the future. Therefore, the finding adoption would not do more harm than good lacks support.

In striking a balance between a parent's constitutional rights and a child's fundamental needs, courts employ the four-part best interests test codified as N.J.S.A. 30:4C-15.1(a), which requires the Division to clearly and convincingly prove:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The best interests factors "are not discrete and separate, but relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

In reviewing a trial judge's decision, we must defer to their factual findings unless they "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div.), certif. denied, 117 N.J. 165 (1989)). So long as "they are 'supported

20

by adequate, substantial and credible evidence,'" a trial judge's factual findings will not be disturbed on appeal. In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). We owe special deference to the Family Part's expertise. Cesare v. Cesare, 154 N.J. 394, 411-13 (1998).

Having reviewed the record, we conclude Judge Wojtenko's factual findings are based on sufficient credible evidence and, in light of those findings, his legal conclusions are unassailable. His decision that termination of defendant's parental rights is in the children's best interests, is amply supported by the record and we affirm substantially for the reasons set forth in his comprehensive and well-written opinion. We add the following comments.

Defendant's attack on the ICPC is a red herring. Unlike Division of Youth and Family Services v. K.F., which defendant relies upon, here the Division had custody. 353 N.J. Super. 623 (App. Div. 2002). The ICPC does not apply to "[t]he sending or bringing of a child into a receiving state by [their] parent." N.J.S.A. 9:23-5. Here, the parents were not sending or bringing the children to another state.

In K.F., the Division used the ICPC to thwart the out-of-state placement of the children with their relatives. We held "[t]he ICPC was intended to

remove, not to create, obstacles to out-of-state placements that are in the best interests of children." Id. at 635. Here, the Division was utilizing the ICPC to achieve reunification with the parents, who moved from state to state, during critical moments in this litigation, frustrating the Division's ability to deliver services to them. The Division's resort to the ICPC was not of its own making.

Regardless, the judge's decision did not hinge on the ICPC, which was but one of many services the parents failed to take advantage of to achieve reunification. The clearest examples of the ICPC not being determinative are the parents' refusal to submit to scheduled evaluations and visitations, despite having accepted Division-funded transportation from both Pennsylvania and North Dakota to New Jersey. The judge correctly concluded the Division had provided "a myriad of services," of which these parents failed to take advantage in New Jersey.

## II.

Defendant argues she was deprived of the fundamental right to represent herself at trial. She raised this issue forty-five days before trial, when she told the judge she wanted to proceed pro se because her attorney was not adequately advocating for her, and she was entitled to organize and control her own defense. Despite this, the judge ignored her and appointed counsel over her objection

A-3992-23

without conducting a proper inquiry, as required by law. She notes the judge questioned the children's father at length on this issue, yet did not conduct the same inquiry of her. The judge's only concern was whether there would be a delay in achieving permanency by allowing defendant to represent herself. However, this clearly was not an issue because trial was adjourned for ten months after defendant asked to proceed pro se and the children were not in permanent placements.

Pursuant to N.J.S.A. 30:4C-15.4, parents have the right to self-representation, but that right is not absolute. N.J. Div. of Child Prot. & Perm. v. R.L.M., 236 N.J. 123, 131-32 (2018). Self-representation cannot impede the adjudication of a case or achievement of permanency for children. Id. at 132. The waiver of the right to counsel must be made "knowingly, intelligently, and voluntarily." Id. at 149. Therefore, the inquiry centers on whether the parent "is capable of making a knowing and intelligent waiver of the right to counsel" and can proceed pro se without disrupting the administration of justice. N.J. Div. of Child Prot. & Perm. v. A.O.J., 464 N.J. Super. 21, 47 (App. Div. 2020).

When a parent wishes to represent themselves, the trial judge should have "an abbreviated yet meaningful colloquy to ensure the parent understands the nature of the proceeding as well as the problems she may face if she chooses to

represent herself." In re Adoption of J.E.V., 226 N.J. 90, 114 (2016). Since trial judges are in the best position to evaluate a party's request to be self-represented, we review their decision whether to grant the party's request for an abuse of discretion. See State v. DuBois, 189 N.J. 454, 475 (2007).

We discern no abuse of discretion warranting our intervention. Defendant's mental health issues were so pervasive, the trial judge concluded she did not understand what it meant to proceed self-represented. Defendant exhibited unstable and manic behavior the day of the hearing. She spoke loudly and out of turn, made irrational remarks, and had "pressured speech." Defendant did not understand trial procedure. When she attempted to share her story, she rambled and provided disjointed testimony. Notably, when trial commenced several months later, defendant neither renewed her request nor bothered to appear.

In addition to not being an abuse of discretion, these facts do not support defendant's argument there was a due process violation or a mistaken application of law. The record unequivocally shows if defendant tried this case herself, the children would not be any closer to the permanency they deserve. We discern no prejudicial error. R. 2:10-2.

## III.

In her supplemental brief, defendant challenges the remand proceedings on due process grounds. She argues, under Rule 5:12-3, the Division was required to allow defense counsel to review its file so counsel could understand how the children were faring since entry of the judgment terminating her parental rights. However, the Division failed to share its file, and the failure to permit the discovery is tantamount to a violation of the sort described in Brady v. Maryland, 373 U.S. 83, 87 (1963). The judge compounded the error by refusing to adjourn the remand proceeding to allow inspection of the Division's file.

Rule 5:12-3 requires the Division to provide all relevant reports or documents it intends to rely upon to the court and counsel for all parties. The Rule also states: "The Division's case file shall also be available for inspection to the attorneys for the parties without court order. All other discovery by any party shall be permitted only by leave of court for good cause shown." Ibid. We review a trial judge's decision whether to permit discovery for an abuse of discretion. See State v. Brown, 236 N.J. 497, 521 (2019).

Here, on remand the judge considered the supplemental record, and found it "merely confirm[ed] that the children were removed" from their placements

25

as "was anticipated by the [c]ourt when it entered its decision in July 2024." The judge found this information was not dispositive because the decision to terminate parental rights was predicated on "parental unfitness and not . . . the children's placements."

Judge Wojtenko's decision not to permit discovery is not reversible error. Rule 5:12-3 notwithstanding, the scope of our remand was limited to two Division contact sheets, which disclosed the children's placement had changed. The Brady violation analogy defendant presses is inapt because, even in criminal cases, "[d]efendants are not permitted to conduct a 'fishing expedition,' or 'transform the discovery process into an unfocused, haphazard search for evidence.'" State v. Arteaga, 476 N.J. Super. 36, 53 (App. Div. 2023) (quoting State v. Ramirez, 252 N.J. 277, 296 (2022)). A review of the Division's file would not have changed the outcome and would have only delayed permanency for the children without any concomitant benefit. In short, no amount of discovery regarding the placement would have overcome the fact that an adoption would not do more harm than maintaining the parental relationship.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division